# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**

           Plaintiff,

                                **Case No. 06-CR-64**

  **v.**

**ALAN KLEBIG,**

           Defendant.

---

## RECOMMENDATION TO THE HONORABLE CHARLES N. CLEVERT, JR. ON THE DEFENDANT'S MOTION TO SUPPRESS

---

On March 21, 2006, the grand jury returned a two count indictment charging the defendant, Alan Klebig ("Klebig") in count one with possessing an unregistered firearm and in count two with possessing an unregistered firearm silencer, both in violation of 26 U.S.C. §§ 5861(d) and 5871. On April 4, 2006, Klebig filed a motion seeking to suppress evidence seized in a search of his home conducted by the Watertown Police Department on October 18, 2005. The court granted, in part, Klebig's request for an evidentiary hearing and an evidentiary hearing was held before this court on May 16, 2006 and continued on June 13, 2006. The United States appeared by Assistant United States Attorney Gail Hoffman. The defendant appeared in person and by counsel Richard L. Kaiser. The Government called Watertown police sergeant Robert Kaminski ("Kaminski"), and Watertown police detectives David Brower ("Brower"), Michael Beisber ("Beisber"), and Katherine Selck ("Selck"). The defendant chose not to testify and the defense called no witnesses. A summary of the evidence adduced at the evidentiary hearing is set forth below. The court

1

ordered the defendant's post-hearing briefs to be submitted by June 23, 2006, the government to respond by July 3, 2006, and the defendant's reply to be submitted by July 10, 2006. The government then sought and received an extension to respond by July 6, 2006 and due to defense counsel's previously scheduled vacation, the defendant's reply was extended to July 20, 2006.

A jury trial is scheduled to begin on **August 28, 2006** before the Honorable Charles N. Clevert, Jr., with a final pretrial conference scheduled for **August 3, 2006**. The pleadings on the defendant's motion to suppress are now closed and the matter is ready for resolution.

## I. EVIDENTIARY HEARING SUMMARY

### A. Sergeant Robert Kaminski

Kaminski testified that on October 18, 2005, he and three Watertown police detectives and one metro drug officer executed a search warrant at Klebig's home located in Watertown. Also accompanying these officers were two uniformed officers who assisted in conducting the initial protective sweep of the residence but then left prior to the actual search of the residence. The officers had obtained the search warrant as part of an investigation of a complaint of damage to the property of Klebig's neighbor. This damage had been apparently caused by an unknown caustic chemical. According to Kaminski, Klebig had been upset with his neighbor because Klebig was previously fined thousands of dollars by building inspectors and Klebig held his neighbor responsible for this.

Klebig had been subject to the attention of the Watertown police for at least four years. Approximately four years before the search warrant was executed, Klebig's house had burned down. The police believed that this fire was caused by chemicals that had been stored throughout the house and it was learned after the fire that Klebig had been repairing a motorcycle in his bedroom. Additionally, approximately one year before the search warrant was executed, Klebig

had contacted the city requesting that a city tree be removed from nearby his property. The city refused, saying that the tree was healthy. However, following the rejection of Klebig's request, the forestry department found the tree with holes drilled in it and what was thought to be some form of chemical in the holes.

Prior to executing the search warrant, Kaminski met with all officers who would be involved and organized a strategy for conducting the search. Each officer was provided a copy of the warrant and they were briefed on the investigation. Specifically, the officers were to first conduct a protective sweep of the residence, as was the standard practice of the department, and then conduct a systematic search of the entire house. The entire house was included because the officers knew that Klebig had a tendency to store chemicals throughout his residence. Kaminski instructed the officers to look anywhere that chemicals could be hidden, including drawers. The officers were not provided any directions or limitations regarding the size of chemicals or containers they were searching for.

Kaminski did not directly participate in the search of the residence but instead oversaw the actions of the other officers. Kaminski was frequently consulted by the officers conducting the search. The searching officers would report to Kaminski what they found and Kaminski would decide which items should be taken. However, Kaminski does not recall any discussion about seizing documents. Although Kaminski was aware of a separate and largely unrelated investigation being conducted by the Postal Inspectors, he was never directed by the Postal Inspectors to seize any property.

Photographs of Klebig's residence that were taken during the search were received into evidence. Photographs marked as Defendant's Exhibits 1-5 depict the basement of Klebig's home. Kaminski testified the basement had a strong odor of chemicals. Apparent chemicals are depicted

3

in all the photographs. Chemicals were also located in the garage. Photos of the garage were received as Defendant's Exhibits 8-11. Kaminski further testified that the odor of chemicals was present throughout the house.

Kaminski testified that when he walked through the house, he saw firearms all over. He reports seeing hundreds to thousands of rounds of ammunition and twenty-five to thirty firearms. Kaminski was not present when the two firearms that are the subject of the indictment were found, but he was called into the room after both weapons had been found and were placed on the bed. One firearm, received into evidence as Government's Exhibit 20, has an oil filter taped to the end of it. At the end of the filter there is a hole roughly the size of a bullet that would be fired from the gun. Detective Michael Beisber told Kaminski that he felt this oil filter may be a silencer. Another weapon, received into evidence as Government's Exhibit 19, was identified by Detective David Brower as a modified .22 caliber rifle. Brower told Kaminski that he believed the weapon was illegal because the barrel had been cut and that the stock had been removed.

Kaminski testified that at some point during the search a game warden was called and arrived to investigate what was later identified as a dead mink in the freezer. Also seized in the search was a bottle of pills bearing the name of Klebig. Kaminski testified that this item was taken because it was found nearby suspected marijuana. Additionally, prescriptions belonging to Klebig's girlfriend were seized. Some of these drugs were not immediately identifiable and thus the officers later conducted an internet search to identify the pills.

### B. Detective David Brower

Brower initially participated in the protective sweep of the residence. Brower testified that he made contact with Klebig and took him to a patrol car. He recalled a surveillance camera pointed at the front door of the residence and another camera covering a side of the house. While

conducting the protective sweep of the residence, Brower observed firearms throughout the house, most of which were loaded.

Brower testified that he took photographs during the search, at first of the rooms in general and then of specific items found as the officers searched. In the master bedroom, a bedroom the officers believed to be Klebig's because the clothing kept in the room appeared to be his, Brower found an oil filter with a hole punched through it. He photographed it and then collected it. Brower then looked under the bed and found a firearm. He unloaded this firearm to render it safe for the officer's searching, as the officers were doing with all firearms found. Brower then again looked under the bed and found a second firearm, the short barreled rifle with scope that was received as Government's Exhibit 19 and is the subject of count one of the indictment. Brower did not immediately recognize the weapon as being a short-barreled rifle until after he had removed the gun from under the bed. Although not an expert on firearms, based upon his training, Brower believed this weapon to be shorter than was legally permitted. This item is depicted in Government's Exhibit 18 and Defense Exhibit 40. In Defense Exhibit 40, Brower circled the abrasion that led Brower to believe that the firearm had originally been a rifle.

Searching the master bedroom along with Brower was Beisber. Beisber found a rifle in the closet with an oil filter taped the muzzle. This rifle was received into evidence as Government's Exhibit 20 and is the subject of count two in the indictment. The firearm is also depicted in Government's Exhibit 17. The oil filter had a hole on the end where it appeared a bullet had been fired through. Based upon his training, Brower recognized the oil filter was a makeshift firearm silencer and knew that such an item was illegal to possess. Although many firearms were found in the home, only the two firearms that are the subject of this prosecution were seized.

Regarding the scope of the search, Brower testified that he was specifically looking for liquid chemicals and would have opened any container that might have been able to hold such an item. However, he testified, that they would have seized dry chemicals if they could have been mixed to create liquid chemicals.

Brower testified that he took a photograph of insurance forms and DVDs because the officers believed that they may be evidence of insurance fraud. The photograph was received as Defense Exhibit 32 and a copy of the insurance forms was received as Defense Exhibit 39.

### C. Detective Michael Beisber

Beisber testified that he participated in the search of Klebig's residence and was familiar with the investigation relating to the damage to Klebig's neighbor's property and the earlier fire at Klebig's home. He testified that he looked under the bed in the master bedroom and alerted Brower to the fact that a gun was under the bed. Brower then recovered a gun but it was not the one that Beisber saw. Brower then recovered a second firearm, the short-barreled rifle that is the subject of count one in the indictment. Upon Brower's retrieving this firearm from under the bed, Beisber immediately recognized it as a long gun with the stock cut off rather than a pistol. Beisber testified he was able to immediately recognize that item was a rifle because the item appeared similar to Beisber's own rifle when he disassembled it.

Beisber also testified that he found the rifle with the oil filter on the barrel in the closet. He states that he immediately recognized the filter as a silencer. However, he testified that since he had never seen anything like it before, he asked the game warden, who arrived later, if he agreed that the oil filter was intended as a silencer. Beisber testified he asked the game warden for his opinion merely to confirm his own belief.

6

Beisber testified that the search was extensive and he opened drawers of all sizes. Also, containers of all sizes were inspected. Beisber testified that various pills were found in a cabinet in the master bedroom. He also searched the entire medicine cabinet and found various other pills. Beisber stated that he moved many of the pill bottles in order to read the names on them. Some of these pill bottles bore the name of Klebig's former girlfriend, whom Beisber knew to have moved out of the state. Beisber stated that he also found two hypodermic needles in a narrow dresser drawer. These items were labeled as arthritis medication but were seized because Beisber believed they may have residue of chemicals in them.

Beisber also testified that he searched the freezer in the kitchen. In the freezer Beisber found additional pills that bore the names of persons other than Klebig, including pills with the name of Klebig's current girlfriend. Items that did not bear Klebig's name were seized. Also in the freezer was an item wrapped in foil. Beisber testified that he picked this item up and upon examining it, claws poked through the foil. He did not know what this animal was when he called the game warden, but Beisber did know it was not a chemical. When the game warden arrived, the warden unwrapped the item and identified it as a mink.

### D. Detective Katherine Selck

Selck testified that she, along with a local prosecutor, prepared the affidavit for the search warrant and Selck was the affiant. This was the first search warrant that Selck had ever obtained. Along with the search warrant, Selck obtained an arrest warrant for Klebig on the state charge of criminal damage to property. She testified that she believed the warrant to be valid, that probable cause existed, and she relied upon the warrant.

Selck testified that she participated in the protective sweep of the residence and then returned to the police station to meet with Klebig. She then returned to the residence and

7

participated in searching the basement. Klebig described the basement as having a strong chemical odor. Selck described the search of the basement as thorough and said that she opened all containers that were not locked. After the basement was searched, Selck searched a bedroom where she found a T-shirt covering a window. Inside the shirt she saw that there was a flashing light that she wanted to investigate. She pulled back the shirt and saw that it was concealing a video camera on a tripod. This camera was pointing out the window and toward the direction of Klebig's driveway and yard but also pointed at his property of the neighbor with whom he was upset. Although Selck could not recall what specifically was taken, she did recall that documents were taken, specifically documents written in Klebig's handwriting, to prove that Klebig lived at the home.

## II. PROBABLE CAUSE TO SUPPORT THE SEARCH WARRANT

A search warrant shall not be issued absent probable cause. U.S. Const. amend. IV. Whether or not probable cause exists for a search warrant is a practical and common-sense determination that, under the totality of the circumstances, there is a fair probability that evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Pless, 982 F.2d 1118, 1124 (7th Cir. 1992). Although probable cause does not require a showing of virtual certainty, it does require more than mere suspicion. United States v. Gilbert, 45 F.3d 1163, 1166 (7th Cir. 1995) (citing Gates, 462 U.S. at 244 n.13). The court may rely upon hearsay in determining probable cause but the court must consider the veracity and bases of knowledge of those hearsay declarants when evaluating whether probable cause exists. Gates, 462 U.S. at 238-39; Pless, 982 F.2d at 1125.

In this case, the validity of the warrant rests entirely upon the sufficiency of the affidavit and the memorandum that was incorporated into the affidavit by attachment. See United States v.

Peck, 317 F.3d 754, 755 (7th Cir. 2003). The search warrant, affidavit, and the memorandum are included in the record as Exhibit A to the government's response to Klebig's motion to suppress.

The memorandum, written by Selck and addressed to Dodge County District Attorney Steve Bauer, describes in summary fashion the conflict between Klebig and his 81-year-old neighbor. Specifically, Klebig is alleged to blame his neighbor for complaints to the city building inspector that resulted in Klebig receiving thirty-three citations totaling over five thousand dollars in fines. There are numerous statements in the memorandum that support the conclusion that Klebig was upset with his neighbor. It appears that Selck was told by the building inspector that Klebig and his girlfriend blame the neighbor for the Klebig's problems with the building inspectors. Later in the memorandum, Klebig's girlfriend is reported as having told a police officer that Klebig blames his neighbor for the citations he received. The memorandum also reports that Klebig's neighbor believes that Klebig is upset with her complaints to the building inspector. However, the memorandum does not provide a basis for the neighbor's belief. Finally, the memorandum reports that Klebig told an officer investigating damage to the neighbor's property that "he is tired of the problems that [his neighbor] is causing him."

The memorandum goes on to describe numerous incidents of property damage, most of which involve damage to the neighbor's property or property of the neighbor's family. On April 20, 2005, Klebig's neighbor reported that a powdery substance was dumped on areas of her lawn. A police officer touched this substance and reported that it dried his skin and caused a burning sensation. He also touched it with leather gloves on and the next day found that a hole had appeared in the leather where he had touched the substance.

On May 3, 2005, Klebig's neighbor reported that her lawn and plants were damaged by an unknown substance.

9

On July 7, 2005, the building inspector issued additional citations to Klebig and noted and photographed an oil leak in Klebig's driveway. Although it is not clear precisely how, the memorandum states that photographs show that Klebig drove a vehicle from his driveway, over the grass separating his and his neighbor's driveways, and then out his neighbor's driveway, leaving an oil spill.

On July 8, 2005, Klebig's neighbor reported a white powdery substance around the gas tank of her lawn mower. This powder appeared to have deteriorated some of the aluminum on the gas tank cover.

On September 11, 2005 a surveillance camera recently installed on the neighbor's property recorded a substance being sprayed across the fence line from Klebig's property and towards the neighbor's property. This substance caused damage to the paint and siding of the neighbor's house and ruined a motion light. The video does not show who sprayed the substance.

On September 30, 2005, forestry crews notified Watertown police that a tree that is in Klebig's boulevard had holes drilled into its trunk and exposed roots. There was an unknown liquid poured into the holes. Earlier in April, Klebig had requested that the forestry department remove the tree because he did not want it near his property. The forestry department refused to take down the tree because it was perfectly healthy but shortly after that refusal, forestry crews had found a wire tightly wrapped around the tree.

On October 13, 2005, Klebig was observed spraying his garden hose at his neighbor's surveillance camera. The following day, while investigating the neighbor's complaints, a police detective observed that five to six mirrors were installed on Klebig's garage and the detective believed they were placed in a manner to shine light at the camera at night.

Case 2:06-cr-00064-CNC   Filed 07/20/06   Page 10 of 21   Document 33

On October 17, 2005, the son of Klebig's neighbor reported the motor oil had been poured over his front sidewalk and driveway. He also reported that a number of dead spots had appeared on his lawn approximately two months earlier and that he had found a liquid and balloon pieces in his yard.

Based upon the totality of the circumstances, the memorandum sets forth probable cause to believe that Klebig caused damage to his neighbor's property. Regarding Klebig's motive to damage his neighbor's property, although all the statements are hearsay, at times double or triple hearsay, the declarants are generally either police officers or other government officials. Law enforcement officers may be generally regarded as reliable sources. United States v. Spears, 965 F.2d 262, 277 (7th Cir. 1992) (citing United States v. Griffin, 827 F.2d 1108, 1112 (7th Cir. 1987); United States v. Pritchard, 745 F.2d 1112, 1120 (7th Cir. 1984)). There is no reason to doubt any of the declarants' veracity of bases of knowledge. Therefore, there are sufficient allegations to support the conclusion that Klebig was upset with his neighbor and blamed his neighbor for the over five thousand dollars in fines he received from the building inspector.

However, obviously, mere motive is insufficient. As substantive evidence to conclude that the damage caused to the neighbor's property was probably caused by Klebig, the video recording of a substance being sprayed from Klebig's property and onto the neighbor's house, the result of which was damage to the house, is substantial evidence indicating that Klebig probably committed the crime. Additionally, although not directly related to the damage of the neighbor's property, the evidence relating to the damage of the city owned tree is relevant. The fact that the two instances are unrelated actually functions as more significant evidence of Klebig's probable responsibility. Based upon the facts set forth in the memorandum, it appears that property that either directly or simply belongs to persons who upset Klebig has an unusual tendency to be damaged by caustic

Case 2:06-cr-00064-CNC   Filed 07/20/06   Page 11 of 21   Document 33

chemicals. Given that caustic chemicals are not necessarily a traditional means of damaging property, the fact that two objects that are apparently related only by the fact that they are targets are of Klebig's displeasure, is all the more remarkable. Additional facts, such as the fact that the neighbor found her lawn mower damaged the day after Klebig received additional citations from the building inspector, further support the conclusion that probable cause existed to believe Klebig had damaged his neighbor's property.

### III. SEARCH WARRANT PARTICULARITY

The Fourth Amendment "categorically prohibits" the issuance of a warrant that does not describe with particularity the objects to be seized. Maryland v. Garrison, 480 U.S. 79, 84 (1987). The particularity requirement serves the vital function of preventing unauthorized invasions in the sanctity of a person's home and preventing the police from indiscriminately rummaging through his property. United States v. Jones, 54 F.3d 1285, 1289-90 (7th Cir. 1995). "As to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant." Id. at 1290 (quoting Marron v. United States, 275 U.S. 192, 196 (1927)). "In practice, courts have therefore demanded that the executing officers be able to identify the things to be seized with reasonable certainty and that the warrant description must be as particular as circumstances permit." Id. (quoting United States v. Brown, 832 F.2d 991, 996 (7th Cir. 1987). A court determines whether a warrant meets the particularity requirement by evaluating whether "an executing officer reading the description in the warrant would reasonably know what items are to be seized." United States v. Hall, 142 F.3d 988, 996 (7th Cir. 1998). However, "[i]f detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized." Id.

The search warrant at issue in this case fails to satisfy the Fourth Amendment's particularity requirement. The warrant permits, without any limitation, the seizure of "[a]ny

12

chemicals." It takes only a minimal amount of imagination to recognize what an incredible number of items may be included under this description. Countless personal hygiene items, ordinary household cleaning supplies, detergents, drugs, and even many foods and baking supplies were subject to seizure under this warrant. The warrant also commanded the seizure of "any oil." Such broad language would apparently include oil of the motor, olive, baby, or countless other varieties. Additionally, the warrant ordered the seizure of "containers containing residue of chemicals." This incredibly broad language authorizes the seizure of countless objects including, quite literally, the kitchen sink on the basis it likely contained residue of the chemical compound hydrogen oxide, more commonly known as water.

This is not an instance where additional particularity was unobtainable. The investigation was focused upon Klebig's alleged use of powerful caustic chemicals and limiting language to that effect could have been easily included in the warrant. Ordinary and relatively benign household chemicals could have been explicitly excluded from the warrant.

This court thus concludes that the search warrant was invalid in that it failed to satisfy the particularity requirement of the Fourth Amendment. Having so concluded does not mean that the fruits of the search need necessarily be suppressed. Even if a warrant lacks particularity, searches conducted pursuant to the warrant may nonetheless be valid under the good faith exception set forth in United States v. Leon, 468 U.S. 897, 926 (1984), provided the officers conducting the search had an objective good-faith belief in the validity of the warrant. Jones v. Wilhelm, 425 F.3d 455, 464 (7th Cir. 2005).

The search warrant at issue here is so obviously facially deficient in describing the particular items to be seized that the court cannot say that a reasonable officer with appropriate training would have believed that the search warrant was valid. Although the court believes that a

reasonable police officer should have been able to immediately recognize that the warrant was defective in its lack of particularity simply by reading the search warrant, it would have become even more apparent that the warrant was defective once that officer undertook its execution. A reasonable officer following the commands of the search warrant would have found himself constantly questioning whether particular ordinary items, ranging from the sodium chloride in the salt shaker to the acetylsalicylic acid (aspirin) in the medicine cabinet, should be seized. The questions would be more substantial when confronted with ordinary household cleaners or detergents that arguably have at least some caustic properties. Therefore, a reasonable police officer should have been able to readily recognize that the search warrant failed to state with particularity the items to be seized and thus Leon's good faith exception cannot save this defective search warrant.

## IV. MANNER IN WHICH THE SEARCH WARRANT WAS EXECUTED

Klebig argues that the officers further violated the Fourth Amendment by the manner in which the officers executed the search warrant, specifically by exceeding the scope of the warrant, searching containers that could not reasonably contain the items they were searching for, and seizing items that were not authorized under the warrant and did not fall within any exception to the warrant requirement. As a consequence of these violations, Klebig alleges, all evidence obtained must be suppressed.

If the scope of a search exceeds what is permitted by the warrant, the search is violates the Fourth Amendment. Horton v. California, 496 U.S. 128, 140 (1990). However, simply because a search is thorough does not mean that the search is beyond the scope of the warrant. United States v. Buckley, 4 F.3d 552, 557 (7th Cir. 1993). "A warrant to search a house or other building authorizes the police to search any closet, container, or other closed compartment in the building

that is large enough to contain the contraband or evidence that they are looking for." United States v. Evans, 92 F.3d 540, 543 (7th Cir. 1996) (citing United States v. Percival, 756 F.2d 600, 612 (7th Cir. 1985); United States v. Ross, 456 U.S. 798, 820-21 (1982); United States v. Griffin, 827 F.2d 1108, 1114-15 (7th Cir. 1987); United States v. Gray, 814 F.2d 49, 51 (1st Cir. 1987).

Klebig argues that the search should have been limited to the basement and garage because these areas were the areas where a person would be most likely to store the caustic chemicals that may have been used in the crimes the police were investigating. This reasoning is unpersuasive. If police were limited to searching the areas where police would expect ordinary and reasonable persons to store such evidence, criminals would simply have to store evidence in nontraditional spaces to avoid police seizure. Klebig's arguments are additionally unpersuasive because the officers testified that the entire house smelled of chemicals. Although the officers found caustic chemicals in the basement and garage, simply because they found caustic chemicals in the one area did not mean that they would not find additional evidence in other areas. Buckley, 4 F.3d at 557 ("Where a warrant permits the search for firearms, the officers need not stop just because they found one.").

Additionally, Klebig argues that the police exceeded the scope of the warrant by searching containers that an officer should have known would not have reasonably contained chemicals like the ones that were likely used in the crimes the officers were investigating. In this regard, the court partially agrees with Klebig. Most notably, the officer's search of the aluminum foil package containing the dead mink in the freezer exceeded even the broadest interpretation of the warrant. Once the clawed paw poked through the foil after being handled, it was plainly apparent that it was not a caustic chemical that could be used to damage property, as the officers would have been

Case 2:06-cr-00064-CNC   Filed 07/20/06   Page 15 of 21   Document 33

authorized to seize if the warrant had been appropriately particular. Nor did it fall within any of the other categories of property that the over-broad warrant permitted the seizure of.

However, the court is not persuaded that the officers were not permitted to search containers such as ring boxes, playing card containers, or underwear drawers. Although small, the officers were unsure of the potency of the caustic chemicals they were searching for and therefore may have been vary small in size. Additionally, although non-traditional spaces for storing caustic chemicals, the officers could reasonably suspect that a person who had used certain items in a crime may seek to conceal these items and therefore may hide them in a place where he would think a person is unlikely to look.

Finally, Klebig argues that the officers seized items not permitted under the warrant, for example, various pills prescribed to Klebig, his girlfriend, or his ex-girlfriend, various unlabeled pills, hypodermic needles, and sheets of paper listing movie titles. It is notable that with the exception of the paper, all other items that Klebig alleges are outside the scope of the search warrant were plainly covered by the text of the search warrant. All the pills, regardless of to whom they were prescribed, are chemicals and hypodermic needles could be used, at least to some degree, to spray chemicals. However, the fact that these items were properly captured within a plain reading of the text of the warrant merely demonstrates the fundamental problem with the warrant's lack of particularity. As items designed for ingestion, they were unlikely of a sufficiently caustic nature to be used to damage property and therefore these items were outside the appropriate scope of the search warrant.

The officers attempted to rationalize the seizure of these items on the basis that possession of another's prescription drugs is a crime but this fails to appropriately explain the seizure. First, the officers knew that Klebig's girlfriend regularly stayed at the residence. Second, it does not

explain the seizure of Klebig's own prescription drugs. The officers attempted to rationalize this seizure on the basis that Klebig's prescriptions were used to provide evidence of ownership of suspected marijuana found in the area. Based upon the facts presented, this explanation seems strained.

Finally, the officers provide no sufficient explanation for the seizure of a list of movies. Two explanations for the seizure were presented. First, it was stated that the list was taken as possible evidence of insurance fraud because it was written on an insurance loss form. However, it is clearly apparent that the form lacks any of the information necessary to serve as a claim form and in fact the necessary information could not be filled in because the appropriate spaces are filled in with movie titles. The form certainly was not plainly evidence of a crime to justify its seizure under the plain view doctrine. Alternatively, it was argued that the item was taken because it was written in Klebig's own handwriting and as such would serve as evidence of Klebig's ownership of the home. This argument, too, is unpersuasive. Aside from the fact that there were surely far better means of proving the defendant's residence in the home, the seizure of this form for the purpose of proving Klebig's residence in the home was not authorized by the warrant. Although seizure of documents to prove ownership of property is commonly included in search warrants, it was not in this case and therefore the seizure violated the Fourth Amendment.

## V. PLAIN VIEW DOCTRINE

The government argues that the firearms that are the subject of the indictment, although not covered by even an expansive reading of the warrant, were appropriately seized pursuant to the plain view doctrine. See, e.g., Horton v. California, 496 U.S. 128, 133-34 (1990).

Although found concealed within a closet or under the bed, as opposed to sitting out in the open, both areas are places where an officer could reasonably expect to discover caustic chemicals

Case 2:06-cr-00064-CNC   Filed 07/20/06   Page 17 of 21   Document 33

that were used in a crime. The short-barreled rifle was identified as such only upon being pulled out from under the bed and inspected, but, nonetheless, it appropriately came within the plain view of the searching officers. Although Klebig is correct that a police officer's mere handling of an item can constitute a search, <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987), the court cannot say that the officers' actions here constituted an unreasonable search to be prohibited by the Fourth Amendment. That police officers would handle and secure firearms found while conducting a search is entirely reasonable. This prevents not only a suspect or other person within the house from suddenly obtaining control of a weapon and using it against the officers, but it also prevents accidental discharge by officers searching. The concern of accidental discharge is particularly real in the present case regarding the short-barreled rifle because the weapon had been modified in such a way so that the trigger guard was removed, thereby greatly increasing the possibility of an accidental discharge of the weapon.

The incriminating nature of the firearms seized was plainly apparent. Regarding the short-barreled rifle, Brower testified that the illegal nature of the item was immediately apparent to him based upon his training and experience. He was able to immediately recognize this firearm as a rifle as opposed to a pistol. Further, he was aware that it was illegal to possess rifles with barrels shorter than fourteen inches and he saw this rifle's barrel to be shorter than that. The court, however, notes both Federal and Wisconsin law actually prohibit possession of rifles with barrels shorter than sixteen inches, 18 U.S.C. §§ 921(a)(8) and 922(a)(4); Wis. Stat. § 941.28 (2003-2004), but Brower's misrecollection of the specifics of the law is irrelevant because the illegal length of the barrel at issue here was nonetheless readily apparent. Beisber, who was also present when the short-barreled rifle was found, said that he was able to immediately identify the firearm as a rifle and not a pistol because the firearm looked similar to his rifle when he took it apart.

18

Regarding the rifle with the oil filter taped to the end, Beisber testified that based upon his training and experience he believed the oil filter was intended to act as a silencer. Brower also immediately identified the oil filter as a silencer and knew that the a silencer was illegal to possess. The fact that the detectives sought the opinions of each other and the game warden as to whether these persons shared the belief that the oil filter was acting as a silencer is irrelevant. The detectives testified that they had independently reached the conclusion that the item was contraband and must be seized prior to consulting the other persons. The detectives certainly should not be faulted for engaging in a confirmatory identification because doing so merely sought to prevent an unnecessary seizure if the detectives' personal beliefs were mistaken.

However, fatal to the government's argument that the firearms were appropriately seized pursuant to the plain view doctrine is the fact that the officer must be lawfully present when the object comes within his plain view. See, e.g., United States v. Raney, 342 F.3d 551, 558-59 (7th Cir. 2003). Because the officers' presence was pursuant to a plainly facially defective search warrant, the officers were not in a lawful position to discover these firearms and therefore the firearms were not properly seized pursuant to the plain view doctrine.

## VI. REMEDY

Although any reasonable police officer should have been able to recognize that the warrant was facially defective and the search was conducted in an unconstitutionally overbroad manner, nonetheless, suppression of the evidence is not necessarily the appropriate remedy. Suppression of evidence obtained in violation of the Fourth Amendment is not constitutionally required. United States v. Espinoza, 256 F.3d 718, 724 (7th Cir. 2001) (citing Leon, 468 U.S. at 906). Recently, the Supreme Court stated that suppression of evidence should be a last resort and not a first impulse. Hudson v. Michigan, 74 U.S.L.W. 4311, 2006 U.S. LEXIS 4677, *9. Further, the remedy must be

proportional to the wrong. United States v. Stefonek, 179 F.3d 1030, 1035 (7th Cir. 1999) (citing United States v. Payner, 447 U.S. 727, 734 (1980); Stone v. Powell, 428 U.S. 465, 490 (1976)). Because the exclusionary rule exists primarily to deter unlawful police conduct, it therefore should be applied in situations where the goal of deterrence would be accomplished. Espinoza, 256 F.3d at 724; Hudson, 74 U.S.L.W. 4311, 2006 U.S. LEXIS 4677, *9-*11.

In the present case, the court believes that suppression of the two firearms seized will serve the exclusionary rule's goal of deterrence. Although ordinarily the proportional remedy when police officers exceed the scope of a search warrant is the suppression of only the evidence seized that was beyond the scope of the warrant, Buckley, 4 F.3d at 558, that limited remedy would be inappropriate here. In the present case, the defects in the search and the search warrant were total and therefore the proportional remedy is total suppression. Not only should a reasonable police officer been able to readily identify the warrant as facially defective, but the officers exceeded even the incredibly overbroad scope of the warrant. The search became a general search, precisely what the Fourth Amendment was designed to protect against. Officers seized items that were not covered under even the most expansive reading of the overbroad warrant or were plainly illegal or evidence of a crime. Rather, officers seized items, most notably the list of movies, which they merely speculated may have been evidence of a yet undiscovered crime.

This sort of warrantless investigatory seizure is precisely what the Fourth Amendment was designed to prohibit. "The Framers resolved to permanently end these 'general warrants.' They knew that in their new Republic crimes would need to be investigated. But they also knew that if authorities could simply rummage through citizens' homes, the path to tyranny would open again." James M. Rosenbaum, In Defense of the Sugar Bowl, 2006 Fed. Cts. L. Rev. 4, 2 (available at http://www.fclr.org/docs/2006fedctslrev4.pdf).

This is not a case of a mere technical defect in the execution of an otherwise valid search warrant, see Hudson, 74 U.S.L.W. 4311, 2006 U.S. LEXIS 4677, but rather the defect goes to the core of what is protected by the Fourth Amendment. Unlike the judicially devised "knock-and-announce" rule at issue in Hudson, the search warrant in the present case failed to comply with the plain demand of the text of the Fourth Amendment that the search warrant particularly describe the items to be seized. Given the multiple substantial constitutional defects that occurred in this search, there is no effective means of deterring the police officers' unlawful conduct other than suppressing all evidence seized.

**IT IS THEREFORE RECOMMENDED** that Klebig's motion to suppress all evidence seized from his home be **granted.**

Your attention is directed to 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Criminal Procedure 59 (b)(2), and General Local Rule 72.3 (E.D. Wis.); whereby written objections to any recommendation herein or part thereof may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

Dated at Milwaukee, Wisconsin, this 20th day of July 2006.

s/AARON E. GOODSTEIN
United States Magistrate Judge
