# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## FINAL JUDGMENT

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

April 8, 2010

BEFORE:

RICHARD D. CUDAHY, *Circuit Judge*

RICHARD A. POSNER, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

| No.: 08-2589 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>ALAN L. KLEBIG,<br>Defendant - Appellant |
|---|---|
| **Originating Case Information:** | |
| District Court No: 2:06-cr-00064-CNC-1<br>Eastern District of Wisconsin<br>District Judge Charles N. Clevert | |

The judgment of the District Court is **REVERSED** and the case is **REMANDED** for a new trial, in accordance with the decision of this court entered on this date.

form name: **c7_FinalJudgment** (form ID: **132**)



CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 08-2589

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALAN L. KLEBIG,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 06 CR 64—**Charles N. Clevert, Jr.**, *Chief Judge*.

———————

ARGUED OCTOBER 30, 2009—DECIDED NOVEMBER 2, 2009
OPINION PUBLISHED APRIL 8, 2010

———————

Before CUDAHY, POSNER and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. A jury convicted Alan L. Klebig of possessing an unregistered rifle and an unregistered silencer, in violation of 26 U.S.C. §§ 5861(d) and 5871. Klebig appealed both his conviction and his sentence. On November 2, 2009, shortly after we heard oral argument in this case, we issued an Order reversing the judgment of conviction and remanding for a new trial. We noted that an opinion would follow our Order. This is that opinion.

## I.

On October 18, 2005, Alan Klebig had a peculiar collection of things in his home and yard. In addition to the dozens of squirrel tails and shiny compact discs that adorned his fence and yard, his house and garage contained dozens (if not hundreds) of containers filled with caustic chemicals and other unidentified substances. The walls and floor inside his garage were covered with tools, cords, cables, canisters, and just plain junk from every imaginable category. Even the rafters of the garage were filled with clutter, including a web-footed doll that was suspended from the ceiling beams by its head. His basement contained a similar collection of chemicals, tools and odds-and-ends covering every shelf, every inch of wall space and most of the floor. Every countertop and tabletop surface in his kitchen was crowded with what can only be described as stuff. He was not a good housekeeper. His living room and bedrooms were also in disarray. His home could not have been considered "guest ready" unless the guests were a hazmat team and a van full of Merry Maids. On his front door, he displayed a small but threatening sign that warned visitors that "Nothing Here Is Worth Dying For." He had installed security cameras to monitor his house and property. An avid hunter, his home held almost two dozen firearms of various types and sizes as well as ammunition and a crossbow and arrows. Some of the guns were stored in a cabinet and a toolbox but many were strewn around the house, blending in seamlessly with the rest of the mess. Near the front door was a loaded shotgun and a

cane that could be pulled apart into "like a Samurai sword type of thing." Tr. at 28.

We know that this was the state of Klebig's home on October 18, 2005 because, at his trial for possessing two unregistered firearms,[1] the government entered into evidence witness testimony and a series of photographs depicting Klebig's home and yard. Klebig was charged under Sections 5861(d) and 5871 with knowingly possessing a firearm and a silencer which were not registered to him in the National Firearms Registration and Transfer Record. The unregistered firearm was a .22-caliber rifle with a sawed-off barrel, a missing stock, and two magazines of ammunition taped together. The total length of the sawed-off rifle was thirteen inches and the barrel was approximately six inches long.[2] This unregistered rifle was found under Klebig's bed, along with a

---

[1] A silencer is considered a "firearm" for the purposes of the statute. See 26 U.S.C. § 5845(a)(7) ("The term firearm means . . . any silencer (as defined in section 921 of title 18, United States Code)"). Section 921, in turn, defines the term "firearm silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

[2] As we have noted, Klebig legally possessed more than twenty other guns. We will refer to the rifle charged in the indictment as the sawed-off rifle or the charged rifle or the unregistered rifle, in order to distinguish it from the firearms he held lawfully.

Playboy magazine, as the government informed the jury in opening statements, and as a government witness helpfully reminded the jury during testimony. The silencer consisted of an oil filter taped to the end of the barrel of a different rifle that was leaning against the wall inside his bedroom closet. Both the unregistered rifle and silencer were seized in a search of Klebig's home on an unrelated matter.[3]

The main issue at the trial was whether Klebig knew that the firearm under his bed possessed the characteristics that required it to be registered as a rifle and whether he intended to use the oil filter as a silencer. Not all rifles are required to be registered in the National Firearms Registration and Transfer Record ("Record") but a "rifle having a barrel or barrels of less than 16 inches in length," or a "weapon made from a rifle if such weapon as modified has an overall length of less than

_____

[3] Klebig was allegedly involved in a dispute with an elderly neighbor. According to the Watertown Police Department, Klebig blamed his neighbor for reporting him to local officials for various property code violations. The local building inspector issued thirty-three tickets to Klebig, resulting in fines in excess of $5000. The neighbor's home and yard were damaged by unknown substances that had been sprayed or poured on her house and lawn. Police officers obtained a warrant to search Klebig's home for chemicals that could cause that kind of damage. That search warrant, which led to the discovery of the unregistered firearms at issue in the instant case, was the subject of an earlier appeal. *See United States v. Klebig*, 228 Fed. Appx. 613 (7th Cir. 2007).

26 inches or a barrel or barrels of less than 16 inches in length" must be registered. 26 U.S.C. §§ 5845(a)(3) and (4). Klebig did not contest the government's characterization of the sawed-off rifle as meeting this definition. Rather, he contended that he did not know it was a rifle but thought it was a modified pistol that did not require registration. Klebig also argued that he did not intend to use the oil filter as a silencer but rather as a flash suppressor, a use that does not require registration. *See* 26 U.S.C. § 5845(a)(7). Because of this defense, Klebig's familiarity with firearms and silencers was a major issue at trial.

Before the jury trial began, Klebig's attorney moved *in limine* to exclude from evidence the sign boasting, "Nothing Here Is Worth Dying For" and also the presence of a surveillance system in Klebig's home. Counsel also sought to exclude references to other items seized from Klebig's house including chemicals, oils, prescription bottles, marijuana, and syringes. He asked the court to prohibit references to the reasons the search warrant was issued in the first place, and any mention of an investigation into damage caused to his next door neighbor's home. He argued that none of this evidence was relevant to the issue of whether Klebig knowingly possessed two firearms without having registered them as required by law. If the court deemed the evidence relevant, he argued in the alternative that any probative value was outweighed by the prejudicial effect of this evidence, and that this was inadmissable character evidence.

At a hearing on the motion, the government agreed it would not refer to the investigation into damage to the

property of Klebig's neighbor. The government also indicated it would not introduce evidence of the marijuana or syringes found in Klebig's home, and agreed it would not refer to the reasons the search warrant was issued. The government argued, however, that the sign and the surveillance were relevant because, like the sawed-off rifle and the silencer, they were anti-burglary devices. The government characterized the sign and the security cameras as "inextricably intertwined" with Klebig's possession of the charged firearms. The sawed-off rifle and the silencer would be intimidating items that would discourage burglars, the government argued, much like the sign and the surveillance system. The court agreed and denied the motion *in limine* as to those items. The court did not expressly address the part of Klebig's motion related to chemicals.

In its opening statement, the government described the charges against Klebig and then turned to "the heart and the meat of this case." The government noted that the Watertown Police Department executed a search warrant on Klebig's home on October 18, 2005:

> They came to his address, and what did they see. They went to the door. They saw two double steel doors, and they saw disks on the side of his property strung up which shined light into a neighbor's house. They knocked on the door and made entry.

> Next to the door before gaining entry they saw a sign that read something along the lines of nothing in this house is worth dying for or nothing in here is worth your life, a sign to that effect.

Tr. at 16. The prosecutor also mentioned a loaded rifle next to the front door, and other rifles, guns and ammunition scattered throughout the house, in the living room, kitchen and bedrooms. The government also described the police officers finding a rifle with an oil filter taped to the end of the barrel in Klebig's bedroom closet. The officers also searched under Klebig's bed:

> One officer pulled out another—a handgun from underneath the defendant's bed. Underneath the defendant's bed were some papers, a Playboy magazine, a DVD, some type of DVD case; but the handgun that they pulled out wasn't the one with the scope that they saw initially.

> They pulled out another gun from underneath the defendant's bed. And what was it. It was a gun with a sawed-off barrel, with a scope on it, with two magazines taped to the bottom of it. Recognizing that as an illegal weapon, they seized that.

Tr. at 18. The officers found on Klebig's bedroom floor another oil filter with what appeared to be a bullet hole shot out on one end. In the second and third bedrooms of the house, the officers found additional firearms and "surveillance equipment for the defendant to monitor the outside of his house. They found somewhere in the neighborhood throughout the house, somewhere in the neighborhood of 50 to 100 squirrel tails." Tr. at 19.

The government's first witness was Detective Michael Beisbier, the Watertown police officer who conducted the search of Klebig's home. After describing his position

and experience and establishing his role in the search, the government explored the particulars of the search:

> Q: And what did you observe outside the house when you arrived?
>
> A: We walked up the—like the front stoop to front door. It's double steel doors that lead into the house. And there's a sticker on the door that said something to the effect of nothing in this residence is worth dying for.
>
> Q: Did you also observe objects strung up along the defendant's property?
>
> A: Yes.
>
> Q: What, if anything, did you observe?
>
> A: Probably 50, 60 squirrel tails hanging throughout the property along with these like CDs hanging from strings.
>
> Q: Were you able to observe the effect that the CDs had hanging on the strings?
>
> A: I guess I didn't see what was on them, no.
>
> Q: Do you know whether it caused a reflection onto the neighbor's property?
>
> A: Yes, yes. They were strung up on the property line.

Tr. at 23-24. After eliciting a general description of the search from Detective Beisbier, the government entered into evidence photographs of the outside of Klebig's house, including photos that depicted, in part, the outside of the front door from across the width of the drive-

way. Using those photos as a reference, the government asked, "And describe to the jury where the sign was or the notice that said words to the effect of nothing in here is worth dying for." The detective answered, "It was on the door. You can't really see it, but as I recall it's on the door." Tr. at 27.[4] The detective also confirmed that the CDs hanging from strings along the property line, which can be seen in two photos, were present on the day of the search.

The government continued to enter into evidence photographs of the interior of Klebig's home, asking Detective Beisbier to point out for the jury the location of firearms and ammunition he found in the living room and kitchen. At this point, Klebig's attorney objected to the prejudicial nature of the testimony pointing out each and every one of the legally owned guns in the home, especially since Klebig had conceded in his opening argument that he possessed a number of guns that he purchased himself and also inherited from his father. Counsel pointed out that the government had been eliciting testimony from Detective Beisbier for a half hour without addressing anything related to the merits of the case. After initially directing the government to limit

---

[4] Indeed, an examination of the photos with a magnifying glass reveals the presence of a sticker that is a few inches square. Any words on the sticker could have been read only by a person standing on the porch, immediately in front of the door. On cross-examination of Detective Beisbier, Klebig's lawyer introduced a closer view of the door, but again, no words were discernable on the small sticker. Ex. 1001.

further testimony to relevant matters, the court reversed itself and allowed the testimony because Klebig had implied in his opening statement that he was not an expert with firearms.

The government next led the witness through a series of photographs taken in Klebig's rather untidy bedroom where the officers found the sawed-off rifle and the long rifle with the attached oil filter. Using the photos as a guide, Detective Beisbier pointed out a dresser on which he found ammunition, the long rifle with the oil filter in the closet, the second oil filter, and the sawed-off rifle recovered from under the bed. Detective Beisbier testified that he saw a firearm under the bed, and warned a fellow officer to remove it carefully because "[n]inety percent of his guns were loaded." Tr. at 41. The other officer removed a silver revolver, and then went back to retrieve the gun Detective Beisbier had seen from his side of the bed:

> I said there's another gun underneath there, Dave, just be careful; and as he set that one down, he went back under. He had to move some items from underneath the bed; papers, a Playboy, I think, or two; and then he had to reach down and pull the gun out, and that's the one—I said to him the one I see has a scope on it. . . . and it was a .22 rifle that didn't have a stock on it and that the end of the barrel was cut off of it.

Tr. at 41. Detective Beisbier testified to then finding a loaded .45-caliber handgun, a crossbow with a quiver of arrows, .12-gauge rounds, approximately 1000 BB gun

rounds, and a container of .45-caliber shells, all in the master bedroom. In addition to the photos, the sawed-off rifle and the long rifle with the oil filter taped to the end were also entered into evidence during Detective Beisbier's testimony.

Detective Beisbier identified photos of the next bedroom, where he found several additional firearms, some in a gun cabinet and some leaning against a wall. Some were loaded and some were not. The second bedroom also contained a surveillance system hooked up to a camera mounted outside and pointing at the front door. In the third bedroom, the detective found another firearm, in a case, leaning against a wall. The room also contained a camera on a tripod facing out the window.

The prosecutor next led Detective Beisbier through a series of photographs of Klebig's basement, which contained a vast array of chemicals and tools, as well as a motorcycle and a number of items that were both odd and alarming in appearance. For example, one photo portrayed a small plastic cooler, the type that a person might carry to a picnic, containing a plastic bag of motor oil. Tr. at 54; Ex. 26. Another portrayed a large soda fountain canister converted to "a like weed eater sprayer gun." Tr. at 54; Ex. 27. Yet another depicted a plastic ice cream tub containing a liquor bottle and a jug. Ex. 28. Detective Beisbier testified, "That are, those are in the laundry room on the shelving just above the washer and dryer, the shelving, that are bottles of I believe to be acid." Tr. at 54. Although a few of the bottles in the basement were identifiable substances such as common

household cleaners and detergents, the vast majority of the containers were unmarked or had illegible labels. On some containers, the words "caution" and "corrosive" were visible, and many of the shelves holding the bottles and jugs were partly corroded. In one picture, the arm of a person wearing a white glove can be seen pulling cords and cables back to reveal five or six plastic gallon-size jugs, each filled with a black substance and hand-labeled "oil." Ex. 33. When Klebig's lawyer objected to these photos and photos of the garage interior on relevance grounds, the government contended that the pictures portrayed "all sorts of things mechanical" and were relevant to Klebig's technical and mechanical abilities. Tr. at 56. Although Klebig's counsel asserted that he had not called into question his client's mechanical abilities, the court overruled the objection.

The photos of the garage were equally odd. One photo depicted a full length mirror leaning against the outside of the garage door, next to a large jug and a bucket on stained concrete. Ex. 37. Detective Beisbier indicated that one of the containers held oil. Tr. at 58. As with most of the other containers in the garage and basement, the jury was left wondering what was in the other one. Five pictures of the garage interior revealed two motorcycles (or parts of motorcycles), several more soda fountain canisters, buckets and jugs containing unidentified liquids and other substances, cables, cords, tools, and crates, as well as a large number of objects that simply cannot be identified. Exs. 38-42. As we noted earlier, a web-footed doll was suspended from the ceiling by its head, and the rafters were also filled with junk. Ex.

38. The amount of clutter was breathtaking. None of the photos from the basement or garage depicted firearms or ammunition.[5]

Earl Griffith, a firearms expert from the Bureau of Alcohol, Tobacco and Firearms ("ATF") testified that he examined the sawed-off rifle and identified it as a Squires Bingham .22-caliber long rifle, manufactured in the Philippines and sold by Kmart in the United States. He noted that the barrel had been crudely cut off, the stock lug had been removed, and the back rear sight had been removed. A scope was mounted on the trigger mechanism. Griffith also displayed for the jury an intact Squires Bingham rifle that had not been modified in any way. He compared the intact rifle to the one found under Klebig's bed and described all of the similarities and all of the differences. In describing the sawed-off rifle, he noted that the front part of the barrel had been removed and the front sight was removed along with it. He remarked:

> See the marks where someone probably used a pipe cutter to take it off; as it goes around and you tighten it, goes around and it came off.

Tr. at 244. He testified that he test-fired the sawed-off rifle and it was capable of being fired. He described the differ-

---

[5] On cross-examination, Detective Beisbier testified that he found two handguns locked in a toolbox in the basement. The guns are not visible in the photos of the basement and the government did not ask Detective Beisbier on direct examination to point out the location of firearms in the basement.

ence between a pistol and a sawed-off rifle, and con-
cluded that Klebig's firearm was a rifle rather than a
pistol. Griffith also testified about silencers and flash
suppressors and opined that the oil filter taped to the
long rifle found in Klebig's bedroom closet functioned as
a silencer. Griffith had seen oil filters employed for
this purpose twenty or thirty times in his career. He
tested the long rifle with the oil filter against a similar
long rifle without a filter and noted that, on average, the
oil filter reduced the rifle report by approximately six
decibels.[6] On cross-examination, the defense questioned
Griffith about pictures of pistols that bore some phys-
ical resemblance to the sawed-off rifle.

After this cross-examination, the government informed
the court that it intended to introduce into evidence the
firearms that Klebig legally possessed and turned over
to law enforcement officers when these charges were
brought against him. Tr. at 331; 368-69. The government
argued that the defense had put at issue Klebig's knowl-
edge of firearms by suggesting that the sawed-off rifle
resembled a number of pistols that were not required to
be registered. The government contended it was relevant
for the jury to see exactly what guns Klebig possessed
and maintained. Klebig's lawyer objected to the physical
presentations of the guns, arguing that the same
purpose could be accomplished with photographs of
Klebig's guns. Tr. at 331-32; 369-70. He asserted that the

---

[6] The report of a firearm is the sound it makes on being
fired. Tr. at 248-49.

prejudice of showing the jury twenty-three additional guns individually or even as a group far outweighed the probative value, especially because the same goal could be achieved through the introduction of color photographs of each gun that the government itself produced. The court overruled the objection without comment.

The government then called to the stand Sergeant Katherine Selck of the Watertown Police Department. The prosecutor handed Klebig's guns to Sgt. Selck one at a time, asking her in each instance to identify the gun, and verify that it came from Klebig. Through this process, the government introduced a Colt Trooper .357 revolver; a Ruger .32 single six-shot; a Davis Industries Model .22, commonly called a Derringer; a Ruger .22-caliber revolver; a High Standard double nine .22-caliber revolver; a .45-caliber Pedersoli black powder; a .50-caliber Connecticut Valley Arms black powder; a Mossberg .12-gauge shotgun; a .20-caliber pellet gun; a Jukar black powder; a Smith and Wesson 38 Special revolver; a Smith and Wesson .177-caliber air gun; a Repeatair Crosman airgun; a .45-caliber Colt Series 70 semiautomatic handgun; a .22-caliber Sears-Roebuck 282; a Crosman airgun; a Western Field .20-gauge shotgun; a Ruger Model .22-caliber; a Remington .12-gauge shotgun; a Western Arms double-barreled shotgun; a Daisy BB pellet gun; a .357-caliber Marlin Model 1897; and a Topper Model .12-gauge shotgun. Each of the twenty-three guns was laid on the floor in front of the witness box, as Sgt. Selck identified them, forming an arc around the witness box. Tr. 370-86. The guns remained on the floor while the court conferred with counsel in a sidebar that occupied three pages of

trial transcript, at which time the jurors were released for lunch. Over the lunch break, Klebig's lawyer asked the court to remove the firearms:

> One last issue, Judge. Can we have the guns removed from the floor and around the witness table over the lunch hour and put someplace else? Right now the record should reflect they are lined up in front of the witness box and around the side on the floor. There's about 25 guns laid out there as well as the guns that are—

Tr. at 405. The court interrupted by stating, "They will be appropriately removed and stored." Tr. at 405. When the jury returned from lunch, the guns were no longer on the floor.

   Some guns returned to the witness stand during the government's cross-examination of Klebig, who testified on his own behalf. On direct, Klebig testified that he owned approximately twenty-five guns, that he had been an avid hunter since the age of sixteen when his father began teaching him to hunt, and that he had inherited about half of his firearms from his father. Klebig also enjoyed target practice, read magazines related to hunting and outdoor activities, and attended gun shows. He explained that the compact discs hanging in his yard were meant to keep mice and squirrels out of his garden. He placed the squirrel tails around his yard after reading in an outdoor magazine that birds would use the fur to make nests. He explained that he had a security system in his home because his work required him to be away from home frequently. He was experimenting

with oil filters, he claimed, to see if they would suppress
the flash of his shotgun. He intended to hunt for a trouble-
some raccoon on his mother's property at night (raccoons
are nocturnal) and did not want to draw the atten-
tion of passing motorists. He testified that he found the
sawed-off rifle in the basement of his father's home after
his father died. He thought it was a pistol missing its
grip or stock. He knew the barrel was sawed-off but
assumed that his father had sawed it off because the
tip had been damaged.[7] After firing the weapon a few
times, he stopped using it because it was inaccurate
and clumsy to hold.

On cross-examination, the government questioned
Klebig about four of his pistols and three of his long guns,
comparing features and asking how he would hold
them and operate them. Tr. at 451-62. It is unclear from
the record how many of the guns were visible to the jury
during this exchange, or where the guns were in the

---

[7] Mark DeBlare, the original owner of the sawed-off rifle,
testified that he broke the stock hitting a raccoon over the head
when hunting. Apparently, the raccoon continued to climb
out of a tree after DeBlare "unloaded the clip into the raccoon."
Tr. at 153. After the attack on the hard-headed and unusually
resilient raccoon, all that remained of the rifle was the barrel
"with a little bit of the wood on it." Tr. at 153. DeBlare later
sold the broken rifle to Larry Klebig, the defendant's brother.
Although the stock was broken, the barrel was intact when
Larry Klebig took possession. The record does not reveal who
sawed off the barrel after Larry Klebig took possession of
the gun.

courtroom. After handing Klebig four pistols, the govern-
ment indicated it was turning the discussion to long
guns. At that point, the court intervened and directed the
government to "remove what's up there, please." Tr. at
453. After questioning Klebig about long guns, the gov-
ernment turned to the collection of firearms as a whole:

> Q:  There are a number of firearms here. Do you see
>     any with a sawed off barrel?
>
> A:  Not that I can see, no.
>
> Q:  All right. So none of them have a sawed off barrel.
>     Are any of them missing a stock?
>
> A:  I see they put some of them back together.
>
> Q:  No. I'm asking you do you see any of your firearms
>     that are missing a stock?
>
> A:  No.
>
> Q:  Do you see any of your firearms that are missing
>     a grip?
>
> A:  No.

Tr. at 460. Presumably, all of Klebig's firearms were
present for this line of questioning but the record does not
reveal how they were displayed. The government also
questioned Klebig about his crossbow and arrows, his
surveillance cameras, and the sign on his door "that said
nothing in here is worth your life or worth dying for,
words to that effect." Tr. at 464.

   Prior to the start of closing arguments and outside the
hearing of the jury, the government told the court that it

wished to argue to the jury that the second oil filter
found on Klebig's bedroom floor "fit" the sawed-off rifle,
and that the "markings match." Tr. at 551-53. When the
court asked the prosecutor to clarify the inference that
she wished the jury to draw from the demonstration,
she replied that, taking the sawed-off rifle and the
second oil filter together, "there's an alternative sugges-
tion that he, in fact, used this as a silencer on this
particular item." Tr. at 552-53. This inference, she con-
tended, was in turn relevant to Klebig's knowledge of
the use of oil filters as silencers. Klebig objected to this
argument because nothing in the record tied those
items together, and nothing in the record supported the
inference the government was attempting to draw, that
Klebig had used the second oil filter as a silencer on
the sawed-off rifle. The court decided to allow the argu-
ment. The government proceeded to demonstrate twice
(once in the first part of closing arguments and once
in rebuttal) that the second oil filter fit on the barrel of
the sawed-off rifle. The prosecutor also told the jury
that the markings on the barrel "matched" the oil filter.
The last thing the jury saw or heard was the second
demonstration of the second oil filter being fitted onto
the sawed-off rifle. Less than an hour after entering
deliberations, the jury sent out a note requesting the
sawed-off rifle, the second oil filter, the long gun with
the oil filter taped to the barrel, and the clip from the
sawed-off rifle, in that order. The court arranged for the
jury to examine those items. The jury later returned a
verdict finding Klebig guilty on both counts. The court
sentenced Klebig to twenty-seven months' imprisonment

on each count, to be served concurrently. Klebig appealed. As we noted earlier, after hearing oral argument, we issued an order reversing the judgment of conviction and remanding for a new trial. We indicated that this opinion would follow.

## II.

On appeal, Klebig challenges the district court's decision to allow evidence relating to the sign on his front door and his surveillance system. He also contends that the court erred in allowing certain evidence relating to his legal possession of other firearms. Finally, Klebig maintains that the court erred in permitting the government to conduct a demonstration during closing arguments that introduced new, unsupported facts into the record. Because we are reversing his conviction and remanding for a new trial, we will not address his claim that the court failed adequately to consider his argument that he was entitled to a sentence of probation with community confinement.

## A.

We review evidentiary decisions for abuse of discretion. *United States v. Wescott*, 576 F.3d 347, 355 (7th Cir. 2009), *cert. denied*, 2010 WL 596600 (2010); *United States v. Millbrook*, 553 F.3d 1057, 1062 (7th Cir. 2009). Some of the evidence admitted in this case forces us to return to first principles. With certain exceptions, all relevant evidence is admissible, and evidence which is not

relevant is not admissible. Fed. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. *See also Huddleston v. United States*, 485 U.S. 681, 687 (1988) (Rules 401 and 402 establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules of Evidence provide otherwise). With respect to the charge of possessing an unregistered short-barreled rifle, Klebig conceded all of the facts of consequence except whether he knew that the firearm was a rifle or a weapon made from a rifle. He conceded that the sawed-off rifle met the statutory definition, that he possessed it, and that it was not registered. He contended that he thought the firearm was a modified pistol that did not require registration. His knowledge of whether this firearm was a rifle or a pistol was thus the central fact of consequence for that charge. On the silencer charge, Klebig again conceded that he possessed the oil filter and that it was not registered. He contested only his knowledge that the oil filter was a silencer and his intent to use it as a device for silencing, muffling, or diminishing the report of a portable firearm. He contended instead that he was testing the oil filter as a flash suppressor, a device which is not required to be registered, and that he did not intend to diminish the report of the rifle and was not aware that the oil filter even had that effect. As with the sawed-off rifle, the only fact of consequence was Klebig's knowledge and intent with regard to the oil filter.

So we begin by asking how a strange and rude sign on Klebig's door threatening that "Nothing Here Is Worth Dying For" makes it more or less likely that Klebig knew the firearm was a modified rifle rather than a modified pistol. Similarly, we must ask whether this sign would help a jury answer the question of whether Klebig knew or intended to use the oil filter as a silencer rather than a flash suppressor. In each instance, the government urged the court below and argues to us on appeal that the sign and surveillance system were admissible under the "inextricably intertwined" doctrine. According to the government, these items are inextricably intertwined with the crime of knowingly possessing unregistered firearms because they are probative of Klebig's:

> security conscious state of mind, which made it more probable than not that he knowingly possessed a sawed-off rifle, and a long rifle with a silencer. Both items, [sic] have menacing appearances, and appear likely to deter an intruder as the sign was meant to do. Thus, this evidence was intertwined with Klebig's knowing possession of these illegal firearms.

Government's Brief at 14. But Klebig's preoccupation with security concerns has nothing to do with his knowledge that the sawed-off rifle was a rifle rather than a pistol or his intent to use the oil filter as a silencer rather than a flash suppressor. Both legal and illegal guns are menacing to a burglar and Klebig legally possessed a small arsenal that would have sent any burglar packing. His legally owned firearms were visible all over the house, but the sawed-off rifle was under his bed (along with a legally

possessed pistol) and the long gun with the oil filter attached was in his bedroom closet. The government has been unable to explain why security concerns make it more likely that a person would know that a modified gun started out as a rifle instead of as a pistol. Klebig did not deny that he knew the gun was in his collection; he denied only knowing that it was a sawed-off rifle instead of a sawed-off pistol. We are hard-pressed to draw any rational connection between sawed-off rifles, silencers and burglars. A person normally saws off the barrel of a gun in order to make the gun easier to conceal.[8] A silencer makes it less likely that the shot would be heard. But neither of these functions makes sense in the context of protecting a home against burglary. There is generally no need to conceal a gun from a burglar and if there was, Klebig admittedly possessed many hand-guns that would have been far easier to conceal and shoot than the awkwardly configured sawed-off rifle. And a homeowner hardly wants to muffle the sound of the shot when taking aim at a burglar. A homeowner

---

[8] Although it is tempting to agree that the intimidating appearance of the sawed-off rifle or the long gun with the oil filter would frighten a would-be burglar, the issue here is Klebig's knowledge and intent about these items. Items that appear substantially identical to the charged items here may be owned legally. Indeed, these very items may be legally possessed if they are properly registered. Whether the items would intimidate a burglar makes it no more or less likely that Klebig knew the firearm was a rifle and whether he intended to use the oil filter as a silencer.

would want the burglar to hear the shot and would likely want neighbors to hear the commotion as well, so that they might alert the police department.

The government's explanation simply does not make sense. It does not take much of a stretch to imagine the real relevance of the sign and the surveillance system to a jury.[9] In combination with his legally owned guns, the vast amounts of clutter, the squirrel tails and compact disks hanging in the yard, and the collection of unidentified but apparently caustic chemicals, the sign and the surveillance cameras make Klebig appear to be a dangerous and perhaps unbalanced man, an oddball, perhaps a survivalist or a gun nut. The government even saw fit to twice mention the Playboy magazines found under Klebig's bed along with the sawed-off rifle, evidence which had no relevance or purpose other than to perhaps embarrass Klebig. This is all character evidence, which is generally inadmissible for the purpose of proving

---

[9] The government also twice took note of the "double steel doors" on Klebig's house as part of his security-conscious attitude. Although the record does not reveal the full composition of the doors, they appear from the photographs to be two ordinary steel entry doors in a side-by-side configuration. According to Consumer Reports, "Steel doors account for about half the market, competing with fiberglass and wood." *See* http://www.consumerreports.org/cro/home-garden/home-improvement/hardware-building-supplies/doors-entry/entry-doors-1004/overview/index.htm (last visited April 5, 2010). There is no evidence in the record regarding whether steel doors are more secure than other types.

action in conformity with that character. Fed. R. Evid. 404(a); *Huddleston*, 485 U.S. at 685; *United States v. Bonner*, 302 F.3d 776, 781 (7th Cir. 2002) (general evidence of the defendant's character is inadmissible in criminal cases). Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, unless that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge." *Huddleston*, 485 U.S. at 685. This evidence that Klebig posted a threatening sign on his door, filled his home with security cameras, and stowed adult magazines under his bed is wholly irrelevant to whether Klebig knew the sawed-off gun was a rifle or a pistol and whether he intended to use the oil filter as a silencer or a flash suppressor.

We have criticized the "inextricably intertwined" or "intricately related" doctrine (as we have called it at times in other cases) as a vague theory that tempts prosecutors to expand the exceptions to Rule 404(b) beyond the proper boundaries of that rule. *United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009), *cert. denied*, 2010 WL 250838 (2010); *United States v. Taylor*, 522 F.3d 731, 735 (7th Cir.), *cert. denied*, 129 S. Ct. 190 (2008). Rule 404(b) concerns evidence of other crimes, wrongs, or acts:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,

provided that upon request by the accused, the prose-
cution in a criminal case shall provide reasonable
notice in advance of trial, or during trial if the court
excuses pretrial notice on good cause shown, of the
general nature of any such evidence it intends to
introduce at trial.

Fed. R. Evid. 404(b). The government's argument about the
sign and the surveillance system is really an argument
that these items were relevant to knowledge and
intent, recognized exceptions to the inadmissibility of
"other acts" evidence. Because knowledge and intent
are allowable uses of other acts evidence, there is no
need to "spread the fog of 'inextricably intertwined' over
them." *Taylor*, 522 F.3d at 735. As we have just noted,
though, neither the sign nor the security system in
Klebig's home shines any light on his knowledge or
intent regarding the sawed-off rifle and silencer. The
aim of Rule 404(b) "is simply to keep from the jury evi-
dence that the defendant is prone to commit crimes or
is otherwise a bad person." *Taylor*, 522 F.3d at 735. Yet
that seems to be exactly the use to which this evidence
was put.

  If this evidence had any slight relevance, it would be
outweighed by the danger of unfair prejudice and confu-
sion of the issues. Fed. R. Evid. 403. *United States v.
Conner*, 583 F.3d 1011, 1025 (7th Cir. 2009). "Evidence is
unfairly prejudicial if it induces the jury to decide the
case on an improper basis rather than on the evidence
presented." *Conner*, 583 F.3d at 1025. *See also Old Chief
v. United States*, 519 U.S. 172, 180 (1997) (evidence is

No. 08-2589                                                    27

unfairly prejudicial when it has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one); *United States v. Rogers*, 587 F.3d 816, 822 (7th Cir. 2009) (same); *United States v. Coleman*, 179 F.3d 1056, 1062 (7th Cir. 1999) (relevant evidence may be considered unfairly prejudicial when it has the capacity to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged). Evidence that Klebig is overly concerned about security, to the point of threatening visitors at the door with an ominous sign, invites the jury to decide the case based on their fear or dislike of Klebig rather than on the real issues in the case, namely, his knowledge and intent. The same is true of the surveillance system and some of the photographs of the extensive clutter present in Klebig's home and garage.[10]

_____

[10] Some of the photographs, which displayed the location of weapons in the house, were relevant to the issue of Klebig's familiarity and comfort with firearms. With appropriate instuctions to the jury on the proper use of those photos, they would be admissible. However, some of the photos, especially those of the basement and garage, showed no evidence of firearms or ammunition and served no purpose other than to show Klebig's prodigious capacity to collect very odd and sometimes dangerous looking clutter. On remand, the court should review the photographs carefully to determine which have relevance to the issues in the case, and which, although relevant, bear a risk of undue prejudice that outweighs their usefulness in helping the jury decide the issues. Irrelevant photos, especially those which do nothing more than make

(continued...)

The court abused its discretion when it concluded that any of this evidence was relevant to the issue of knowledge and intent. We will defer for now the issue of whether this error was harmless so that we may consider all together any errors made at trial.

## B.

Klebig also challenged the introduction of certain evidence relating to the guns he legally owned. Klebig concedes that his ownership of these weapons was relevant to the issue of his familiarity with firearms. He put that issue into play when arguing that he did not know the sawed-off rifle was a rifle but thought that it was a pistol, and when he contended that he was using the oil filter as a flash suppressor and was not aware it would also reduce the report of the gun. He objects, however, to the amount of evidence relating to the legal guns, and the manner in which it was presented. In particular, he complains that the government led Detective Beisbier through a room-by-room description of the firearms and ammunition he found in the house, and followed up each of those instances with a photograph, so that Detective Beisbier could point out the locations of various weapons and ammunition he had just mentioned. The government then introduced into evidence each of the legally owned firearms Klebig pos-

---

[10] (...continued)
Klebig appear to be a strange or dangerous man, should be excluded.

sessed, over Klebig's objection. Klebig argued to the district court that photographs of the guns would serve the same purpose of demonstrating Klebig's extensive experience with firearms without the unnecessarily prejudicial effect of displaying approximately two dozen guns to the jury. When the local police department took custody of Klebig's legally owned guns, the officers took photographs of each gun for inventory purposes, and the government possessed eight-inch-by-eleven-inch color photos of each weapon as a result. The court overruled Klebig's objection and his alternate suggestion without comment. As we described above, the government then led Sergeant Selck through the introduction and identification of approximately twenty-three firearms, laying each on the floor in an arc around the witness stand as they were identified.

The potential prejudice of this evidence was apparent to the government. The prosecutor sought to reassure the jury repeatedly that the weapons had been rendered safe for the courtroom. Near the beginning of Sergeant Selck's testimony, the prosecutor asked her to confirm that courthouse building security had cleared the weapons before they came into the building, and that they had also been examined and cleared by the courtroom bailiff. Tr. at 372-73. During closing arguments, the government showed the jury the intact version of the sawed-off rifle, pointing out the size of the bore hole at the end of the muzzle. In doing so, the government sought to demonstrate that the weapon's flash would be correspondingly small, calling into doubt Klebig's claim that he wanted to use the oil filter as a flash suppressor. Tr. at

563. In order to make her point that the bore hole was small, the prosecutor literally asked the jury to look into the barrel of the rifle. Acknowledging the jury's discomfort with the firearm she was demonstrating, the government attorney assured the jury that the firearm was safe, telling jurors, "I'm being safe with this firearm," "if anyone is uncomfortable let me know," and "I don't mean to make any of you uncomfortable." Tr. at 563. She followed up the display of this single firearm with another reassurance: "And I would say just for everyone's comfort level that these tags represent that the firearm is secure. So I just wanted to make sure you know that." *Id*. In response to Klebig's closing argument, the government again mentioned the safety of the firearms appearing in court:

> And just so you know, before these firearms come into court, Special Agent Handy from ATF, over there, he checks them every day. He has plastic tabs on all of them. They're all safety-checked before they come in here. CSO Hill, who is over there, checks them before they come into court. Those—Mr. Klebig's guns were all inspected by Special Agent Handy and by Mr. Hill before they came in here. So, I mean, just to assure anyone if they had thought—They're all safe.

Tr. at 579. These were acknowledgments that people generally fear guns, and that the physical presence of a large number of guns would cause a jury some anxiety.

Conceding that some evidence about the legally owned firearms was relevant to the key issue in the case, Klebig argued that the evidence should have come in through

less prejudicial photographs. The government would still have been able to make its point, Klebig contends, that he was familiar with firearms and could tell a modified rifle from a modified pistol. Although relevant evidence is presumptively admissible under Fed. R. Evid. 402, a court has the authority to exclude it if the risks posed by the introduction of the evidence significantly outweigh its probative worth. Fed. R. Evid. 403; *Mihailovich v. Laatsch*, 359 F.3d 892, 906 (7th Cir. 2004). Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

"Rule 403 thus calls upon the district court to weigh the need for and probative value of the evidence against potential harm that its admission might cause." *Mihailovich*, 359 F.3d at 906; Advisory Committee Note (1972).

We review a district court's ruling under Rule 403 for abuse of discretion. *United States v. Ellis*, 548 F.3d 539, 543 (7th Cir. 2008); *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008). Klebig's familiarity with guns was one of the key issues in the case, given his defense that he mistook the sawed-off rifle for a pistol and he did not intend to use the oil filter as a silencer. That Klebig owned and personally maintained a wide variety of handguns and long guns was highly relevant to whether he could tell the difference between the two when a

weapon had been modified as was the sawed-off rifle. The appearance of Klebig's handguns and long guns was therefore relevant. Klebig's comfort and familiarity with firearms was also relevant, and so the fact that he stored loaded weapons throughout his home was fair game for the government to raise.

   Two dozen guns in a courtroom is undoubtedly an alarming sight. The prosecutor's repeated assurances that the weapons were not loaded and that all were examined multiple times to verify that they were secure demonstrated an awareness that jurors would be apprehensive in the presence of this much weaponry. To make the point that Klebig was very familiar with firearms, it was not necessary to lay two dozen guns out on the floor around the witness box. Nor was it necessary to repeat evidence regarding Klebig's gun ownership multiple times. The court appeared to give little consideration to whether the government could make the same points with photographs rather than the actual guns, or with photographs of some guns and physical specimens of a limited number of the guns. Some of the guns would likely make the salient point better than others. We do not mean to suggest that it was not appropriate to bring any of the guns into the courtroom, but the display on the floor of guns fanned out around the witness box served no purpose other than to emphasize the sheer volume of weaponry that Klebig owned. The effect was to display his dangerousness rather than his knowledge or expertise with firearms. Because the district court allowed the evidence without comment, it is difficult to assess the court's weighing of the need for and probative

value of this evidence against the danger of unfair preju-
dice. There were far less prejudicial ways to display
the guns and Klebig's familiarity with them, and on
remand, the court should manage the presentation of
this evidence to focus on Klebig's knowledge and intent
rather than on the sheer number of guns he possessed.

## C.

Klebig also objects to the district court's decision to
allow the government to conduct a demonstration during
closing argument that had the effect of introducing new
facts into the record. After the close of testimony and
prior to the start of closing arguments, the government
alerted the court that it wished to argue to the jury that
the second oil filter found on Klebig's bedroom floor "fit"
the sawed-off rifle, and that the "markings match." Tr. at
551-53. Klebig objected to this argument because nothing
in the record tied those items together, and nothing in the
record supported the inference the government was
attempting to draw, that Klebig had used the second oil
filter as a silencer on the sawed-off rifle. The court decided
to allow the argument. In closing, the government con-
tended that the primary issues were whether Klebig
knew that the sawed-off rifle was a modified rifle
rather than a modified pistol, and whether Klebig in-
tended to use the oil filter as a silencer as opposed to a
flash suppressor. In questioning the credibility of Klebig's
claim that he intended to use the oil filter as a flash sup-
pressor, the government argued that the second oil filter
found on the floor of Klebig's bedroom fit on the end of

the sawed-off rifle. Klebig had testified that he had tried the second oil filter on the same long gun on which the charged oil filter was mounted. In the excerpt below, Exhibit No. 1 was the long rifle with an oil filter taped to the end of the barrel, Exhibit No. 2 was the sawed-off rifle, and Exhibit No. 4 was the second oil filter recovered from the bedroom floor.

Now, I'm going to show you something with regard to Exhibit No. 2, the sawed off rifle, and Exhibit No. 4. Now, Mr. Klebig or the defendant testified that coincidentally he had only used Exhibit No. 1 ten years prior to approximately October 16th. So if his testimony is to be believed, on October 16th for the first time in ten years he takes out Exhibit No. 4 along with Exhibit No. 1, he goes to a quarry, he tests Exhibit No. 4 on Exhibit No. 1, and then he goes ahead and tests Exhibit No. 1 as it is in its entirety.

And then if his testimony is to be believed on that date, because he's testing two oil filters, he has to bring the tape out with him, he has to bring the equipment necessary to bore the hole in to get it in and out. He has to bring all of that to the quarry, if his testimony is to be believed. So that for the first time in ten years he goes to the quarry.

Well, here's a demonstration. Exhibit No. 2 underneath his bed, Exhibit No. 4 on the floor of his bedroom. The markings fit, the oil filter fits.

Members of the jury, based upon the proximity of the oil filter to this weapon which was underneath his bed the defendant indeed did have the intent to use

Exhibit No. 1 as a silencer and, in fact, had already used it as a silencer and, in fact, had used, potentially used Exhibit No. 4 on Exhibit No. 2. It fits.

Tr. at 561-62. In his closing argument, Klebig compared transcripts of the government's closing argument with the ATF agent's testimony. Klebig noted that the government's own expert witness had opined that the marks on the barrel of the sawed-off rifle were probably caused by a pipe cutter. Klebig had no opportunity to cross-examine the ATF expert about the government's claim that the marks were caused by the oil filter found on the floor rather than by a pipe cutter. Klebig was thus forced to argue against the demonstration without having any opportunity to test the government's claim on the stand. There is no way to know on this record whether the ATF expert would have backed up the government's theory about how the marks were created on the rifle barrel. Counsel had no opportunity to cross-examine the government's expert on this point, and had no opportunity to put his client back on the stand to deny or explain this new evidence.

The government later closed its rebuttal argument with a second demonstration, aided by some of the photographs of Klebig's bedroom that had been entered into evidence:

What you see first is the firearm, Exhibit No. 1, in the defendant's closet with his clothes. This is a picture of the scene on October 18th. The next shot documents where Exhibit No. 4 was found. Exhibit No. 4, an oil filter, was found in the defendant's bedroom.

Next picture, please. The next exhibit documents the Exhibit No. 2 after it was pulled out from the

defendant's bed—underneath the defendant's bed. Now, I'm going to step out from behind the podium for a minute, and I'm going to speak loudly. Special Agent Griffith did testify that he thought this might have been some vice grip or something like that, but that's not inconsistent with the thread mark—with it matching the thread marks from the oil filter. You'll have the opportunity to do this yourself.

You take Exhibit No. 2 with Exhibit No. 4, they were in close proximity to each other in the bedroom, and you put them on. It's a match. The blue ink is worn away to fit the threads of this oil filter. The sight here is gone. There would have been a sight—There would have been a sight here. If there was a sight here, you couldn't put the oil filter on.

The proximity of Exhibit No. 4 to Exhibit No. 2 in the defendant's bedroom, a match, is inconsistent with his testimony that he used this as a test for Exhibit No. 1. It doesn't work. There's a Latin phrase I learned once, res ipsa loquitur, the thing speaks for itself, and that's exactly what this does.

Members of the jury, all you need to do is look to the defendant's testimony in conjunction with what you know to be true in this case, and you will—and there is sufficient evidence to find the defendant guilty beyond a reasonable doubt on Count One and Count Two. Thank you.

Tr. at 599-600.

As we noted above, the last thing the jury saw or heard was this second demonstration of the second oil filter

being fitted onto the sawed-off rifle. Less than an hour after entering deliberations, the jury sent out a note requesting the sawed-off rifle, the second oil filter, the long gun with the oil filter taped to the barrel, and the clip from the sawed-off rifle, in that order. The court arranged for the jury to examine those items, and the jury later returned a verdict of guilty on both counts of the indictment. Klebig contends that the prosecutor's demonstration and argument relating to the demonstration were improper and constituted prosecutorial misconduct.

In reviewing a claim of prosecutorial misconduct, we consider first whether the challenged remark by the prosecutor was improper, and second, whether it prejudiced the defendant. *Wescott*, 576 F.3d at 355; *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1718 (2008). Klebig argues that the demonstration and accompanying argument were improper because they were not based on evidence in the record, but rather constituted new evidence. Although prosecutors may not "infuse their closing arguments with facts that the court has not admitted into evidence, they may argue reasonable inferences from the evidence that the jury has seen and heard." *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995). *See also United States v. Doyle*, 771 F.2d 250, 258 (7th Cir. 1985) (closing arguments are limited to the facts evidence); *United States v. Vargas*, 583 F.2d 380, 385 (7th Cir. 1978) (counsel may make arguments reasonably inferred from the evidence presented).

At some point, however, the inference asked to be drawn will be unreasonable enough that the sugges-

>tion of it cannot be justified as a fair comment on the
>evidence but instead is more akin to the presentation
>of wholly new evidence to the jury, which should
>only be admitted subject to cross-examination, to
>proper instructions and to the rules of evidence.

*Vargas*, 583 F.2d at 385. *See also Doyle*, 771 F.2d at 258
(same). Whether an inference is reasonable will, of course,
depend on the particular facts of the case. *Waldemer*, 50
F.3d at 1384 (the term "reasonable inference" must be
defined contextually). "Whether the evidence bears
logical and proximate connection to the point the pros-
ecutor wishes to prove are perhaps the most obvious
considerations in determining whether the inference is
reasonable." *Waldemer*, 50 F.3d at 1384. Another factor
to consider is whether the prosecutor makes the argu-
ment solely to inflame the passions of the jury. *Id*. In
*Vargas*, we also deemed relevant whether the prosecutor's
statement would have been subject to a colorable objec-
tion if introduced during the trial. *Vargas*, 583 F.2d at 385;
*Waldemer*, 50 F.3d at 1384. In *Waldemer*, we questioned
the utility of this last consideration, but concluded it
could play into the calculus of whether the prosecutor's
statement was a reasonable inference. *Waldemer*, 50 F.3d
at 1384.

    With these standards in mind, we turn to the prosecu-
tor's statements here. In particular, Klebig contends that
the government stated new facts when the prosecutor
asserted, "The markings fit," and "It's a match. The blue
ink is worn away to fit the threads of this oil filter." Tr. at
561-62 and 599-600. Additionally, the prosecutor implied

that Klebig had already used the second oil filter as a silencer on the sawed-off rifle, and also implied that because he had used the uncharged oil filter as a silencer on the sawed-off rifle, it was more likely that he intended to use the charged oil filter as a silencer:[11] "Members of the jury, based upon the proximity of the oil filter to this weapon which was underneath his bed the defendant indeed did have the intent to use Exhibit No. 1 as a silencer and, in fact, had already used it as a

---

[11] Any doubt that this inference was the one the prosecutor wished the jury to draw may be dispelled by the prosecutor's argument to the court. When the court asked, "[W]hat inference are you suggesting should be drawn from what you just demonstrated?" the prosecutor answered, "The defendant's knowledge is at issue, I think that's clear from his testimony and all the arguments, his knowledge or his intent to use Exhibit No. 1 [the charged oil filter attached to the long gun] as a silencer as opposed to a flash hider or flash suppressor. Here we have this oil filter that was located on the floor. This [presumably the sawed-off rifle] was located underneath the bed. It was loaded. The markings match. The defendant testified that he used this [the second oil filter] at the quarry on Exhibit No. 1 [the long gun]. My argument is that, you know, it would be, take these two pieces of evidence and you put them together, there's an alternative suggestion that he, in fact, used this [the second oil filter] as a silencer on this particular item [the sawed-off rifle]. I'm not saying that there is testimony. I'm just saying based on the evidence in the record that that's a fair inference that the jury can draw which goes to his knowledge of the use of these silencers." The court replied, "You may proceed." Tr. at 552-53.

silencer and, in fact, had used, potentially used Exhibit
No. 4 on Exhibit No. 2. It fits." Tr. at 562. In effect, she
asked the jury to infer that Klebig had used a different oil
filter as a silencer on a different gun (the sawed-off rifle),
and that this made it more likely that he intended to use
the charged oil filter as a silencer on the long gun. An
argument that a defendant is more likely to be guilty of
the charged crime because he committed the same crime
on another occasion is a propensity argument, and as
such, it would be subject to a colorable objection had it
come in as evidence rather than as argument in closing
statements. Fed. R. Evid. 404(b). The prosecutor also
added to the testimony of the government's own expert
by claiming that the expert's testimony was not inconsis-
tent with her new theory: "Special Agent Griffith did
testify that he thought this might have been some vice
grip or something like that, but that's not inconsistent
with the thread mark—with it matching the thread
marks from the oil filter." Tr. at 599-600.

   The issue before the jury was whether Klebig intended
to use the oil filter that was taped to the barrel of a long
gun as a silencer rather than as a flash suppressor. Several
physical objects relevant to the prosecutor's argument
had been admitted into evidence, including the long gun
with the oil filter taped to the barrel, the sawed-off rifle
and the second oil filter found on the floor of Klebig's
bedroom. The first inferential leap the prosecutor made
was that the second oil filter made the marks on the
barrel of the sawed-off rifle. She next asserted that the
marks were a match, that the oil filter fit, and that this
was evidence Klebig had used the second oil filter on the

sawed-off rifle. According to the prosecutor, Klebig was therefore lying when he said he had tried out the second oil filter on the long gun to which the charged oil filter was attached. She then drew the final connection, contending that Klebig had already used the second oil filter as a silencer on the sawed-off rifle, making it more likely that he was using the charged oil filter as a silencer on the long gun.

We conclude easily that it was error to allow the demonstrations and accompanying commentary.[12] *Wescott*, 576 F.3d at 355; *Serfling*, 504 F.3d at 677. The government's demonstration asserted new facts that seemed to conflict with the testimony of the government's own expert. A number of leaps were required to travel from the assertions that the second oil filter fit the sawed-off rifle to the conclusion that the government sought to prove, that Klebig intended to use the charged oil filter as a silencer

---

[12] The government sought to assure us at oral argument that the prosecutor alerted the trial court to this argument before making it before the jury, and thus did not engage in prosecutorial misconduct in the usual sense of that term. Although it was admirable that the prosecutor sought to get the court's approval before attempting this unusual closing argument demonstration, from the defendant's perspective the effect was the same whether or not the prosecutor had a wrongful motive in making the argument. Because allegations of prosecutorial misconduct are based on notions of due process, the inquiry focuses on the fairness of the trial and not the culpability of the prosecutor. *See United States v. Velez*, 46 F.3d 688, 691 (7th Cir. 1995).

on the long gun. One of those leaps involved propensity evidence that may be admitted, if at all, only with proper limiting instructions. Klebig may well have raised a successful objection had the government sought to prove this point at trial. In addition, the government muddied the waters further by stating that the ATF agent had testified the marks were caused by "some vice grip or something like that" when the agent had in fact said the marks were likely caused by a pipe cutter. Tr. at 244. Our review of the record finds no reference to a vice grip in the trial.

   The government argues that the prosecutor was simply characterizing the appearance of admitted items, and that the jury could examine the evidence and conclude whether the government's characterization was correct. Citing *Velez*, the government maintains that "when the jury has the evidence in its possession and is equipped to ascertain whether the government's characterization is accurate, a statement characterizing that evidence is not improper." *Velez*, 46 F.3d at 692. In *Velez*, a drug trafficking case, a scale was admitted into evidence. During closing arguments, the prosecutor stated to the jury that the scale had a "white powder residue on it." 46 F.3d at 691. The court found this was not improper because the jury could look at the scale and decide if the statement was correct based on its own observation. But the prosecutor in Klebig's case went far beyond describing the markings on the barrel of the sawed-off rifle. She stated that the markings fit, that they were a match, and that the blue ink was worn away to fit the threads of the second oil filter. The fit, the

match, the cause of the discoloration on the barrel were not facts that the jury could simply confirm by looking at the evidence. The government's own expert had an entirely different explanation for how the marks were caused and what they "fit" or "matched." The marks were likely made by a pipe cutter, according to the ATF agent. The marks may or may not have been caused by or been consistent with the second oil filter. We cannot say because this evidence was allowed for the first time in closing arguments when there was no opportunity to test it. This very subject matter of the cause of the marks had already been the topic of expert testimony and was not a readily observable "fact" like the existence of white powder residue on a scale.

We next consider whether Klebig was prejudiced by this error, and we conclude that he was. To assess the prejudice of the improper demonstration, we must consider it in light of the whole trial to determine if it deprived Klebig of a fair trial. *United States v. Cheska*, 202 F.3d 947, 950 (7th Cir. 2000). In assessing the effect of improper remarks on the fairness of the trial, a court should consider the nature and seriousness of the remarks; whether the remarks were invited by the conduct of defense counsel; whether the district court sufficiently instructed the jury to disregard the remarks; whether the defense could counter the improper remarks through rebuttal; and finally, whether the weight of the evidence was against the defendant. *United States v. McMath*, 559 F.3d 657, 667 (7th Cir.), *cert. denied*, 130 S. Ct. 373 (2009); *Serfling*, 504 F.3d at 677; *Cheska*, 202 F.3d at 950.

This was not a single, off-handed remark, but rather a demonstration and commentary that occurred twice in the government's closing arguments. The implication of the demonstration was that Klebig lied about testing the long gun with the oil filter to see if it would suppress the gun's flash because Klebig had also used an oil filter on the sawed-off rifle, in that case as a silencer. When it sent out a note to the court during deliberations, the jury specifically asked to see the second oil filter and the sawed-off rifle, among other things, apparently taking the prosecutor up on her suggestion that the jurors could themselves repeat the demonstration. There were no charges pending relating to the second oil filter, and we are hard-pressed to explain why the jury wanted to see it except to repeat the demonstration. The demonstration was not invited by anything that defense counsel said during the trial or during closing statements. Although the jury was instructed that the arguments of counsel were not evidence, it is difficult to know how the jury would have applied this admonition to the prosecutor's demonstration and accompanying commentary.

Of course, Klebig had no opportunity to cross-examine ATF Agent Griffith on the government's claims that the marks on the barrel of the sawed-off rifle were "a match" with the uncharged oil filter, that the marks were caused not by a pipe cutter but by the oil filter, and that the oil filter had worn away the blue ink on the barrel to fit the threads of the filter. Klebig had no opportunity to ask the government's expert if the government's claim was in fact consistent with his testimony that the marks were caused by a pipe cutter, as the government

asserted. Without knowing during the trial that the government was going to argue that Klebig had already used the second oil filter on the sawed-off rifle, Klebig had no opportunity to explain or deny this assertion when he took the stand in his own defense. Nor was he able to object to this assertion as improper evidence under Rule 404(b). If the government's remarks would have been subject to a colorable objection if introduced as evidence during the trial, "it is important to enforce carefully the limitation that the inference be reasonable not only to avoid abridging the defendant's right to cross-examine possibly untrue testimony but also to prevent a party from presenting to the jury in closing argument a fact that might have been ruled inadmissible at trial (or at least subject to a limiting instruction) simply by asserting in closing argument that the jury could infer it from the evidence that was presented and admitted." *Vargas*, 583 F.2d at 385.

A demonstration such as the one conducted by the prosecutor twice in closing arguments should have been conducted, if at all, with a witness on the stand who could assert from first-hand knowledge or by expert opinion that the government's theory was plausible. And Klebig should have been given an opportunity to test that theory through cross-examination, and to present his own evidence on the subject. Finally, if the government intended to argue that Klebig had engaged in the same conduct with a different filter and a different gun than the filter and long gun charged in the indictment, Klebig should have had the opportunity to challenge this as propensity evidence, and request a limiting in-

struction. *Vargas*, 583 F.2d at 386 (the need for caution is particularly prevalent when the government's statement involves evidence which, although arguably admissible, is subject to objections under Rules 403 and 404, which is recognized to be perhaps the most prejudicial kind of evidence). The prejudice to Klebig has been established.

### III.

There were thus three errors in the trial. First, the court should not have allowed the government to place into evidence the threatening sign and security system, which together with other irrelevant, prejudicial evidence had the effect of inviting the jury to convict Klebig based on their fear or dislike of him. Second, the court should have more carefully managed the introduction of evidence relating to Klebig's extensive collection of legally owned guns, so that the presentation would have focused on the relevant issue of Klebig's knowledge of and familiarity with firearms instead of on the sheer volume of fire power that Klebig possessed. Finally, the court should not have allowed the two demonstrations to take place during closing arguments, but rather should have required the government to enter this evidence, if at all, through a witness who could be cross-examined. The effect of all of these errors was to cause the jury to see Klebig as an odd man and perhaps a dangerous one, and to decide the case on that basis rather than on the issue of Klebig's knowledge and intent related to the sawed-off rifle and the oil filter taped to

the barrel of the long gun. The errors, taken together, were not harmless. *See United States v. Blanchard*, 542 F.3d 1133, 1151 (7th Cir. 2008) (the test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded); *United States v. Emerson*, 501 F.3d 804, 813 (7th Cir. 2007) (same). *See also United States v. Santos*, 201 F.3d 953, 965 (7th Cir. 2000) (in determining whether a conviction should be upheld despite the presence of error, a court is required to assess the harm done by the errors considered in the aggregate). Without the improperly admitted evidence, the prosecution's case here would have been considerably weaker. The evidence on Klebig's knowledge of the nature of the sawed-off rifle and his intent to use the filter as a silencer was not so strong that we can be confident that the jury would have convicted Klebig in the absence of these errors. We therefore reverse Klebig's conviction and remand for a new trial, conducted consistently with this opinion.

REVERSED AND REMANDED.

4-8-10

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

June 1, 2010

To:     Jon W. Sanfilippo
        UNITED STATES DISTRICT COURT
        Eastern District of Wisconsin
        Milwaukee , WI 53202-0000

|  |  |
|---|---|
| No.: 08-2589 | UNITED STATES OF AMERICA,<br>Plaintiff - Appellee<br><br>v.<br><br>ALAN L. KLEBIG,<br>Defendant - Appellant |

| **Originating Case Information:** |
|---|
| District Court No: 2:06-cr-00064-CNC-1<br>Eastern District of Wisconsin<br>District Judge Charles N. Clevert |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

PARTIAL RECORD RETURN            Record to be returned later

Pleadings to be returned later:            1

Transcripts to be returned later:            3

Exhibits to be returned later:            1

Sealed Envelopes to be returned later:            1

This notice sent to:

[ ]       United States Marshal                [ ]       United States Probation Officer

**NOTE TO COUNSEL:**

If any physical and large documentary exhibits have been filed in the above-entitled cause, they are to be withdrawn ten (10) days from the date of this notice. Exhibits not withdrawn during this period will be disposed of.

Please acknowledge receipt of these documents on the enclosed copy of this notice.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Received above mandate and record, if any, from the Clerk, U.S. Court of Appeals for the Seventh Circuit.

**Date:**                                          **Received by:**

_____6/1/10_____          _____D. McLeod Brock_____

form name: **c7_Mandate** (form ID: **135**)